Our third case for argument this morning is United States v. Kevin Shibilski. Mr. Brewster, whenever you're ready. Your Honors, this is a case involving a complete surprise that occurred at the sentencing of Mr. Shibilski. What had happened was Mr. Shibilski was indicted in connection with a company called 5R relating to funnel glass storage and EPA violations as well as unpaid payroll taxes for 5R and then two subsequent companies of reform, Pure Extractions and WLS. After a year and a half or thereabouts and I think 1.6 million pages of discovery supplied by the government, the government in essence conceded to a plea agreement that Mr. Shibilski was not responsible and it would be dismissed with regard to any environmental concerns with regard to the funnel glass and also with regard to 5R's payroll tax liability, it would be dismissed and he would only be charged with the subsequent companies that he helped form and operate beginning in late 15 through 16, namely Pure Extractions and WLS. That plea agreement was forged after a lengthy proffer and that plea agreement was forged with a clear understanding that the government may seek to assert relevant conduct in connection with the 5R liability. Mr. Shibilski was a lawyer. He stayed in that same position but had acquired 15% of the stock. Ultimately he ended up getting 25% of the stock by January of 15 and that was on the basis of his guaranteeing loans and acquiring financing for the company unbeknownst to Mr. Shibilski when he joined in that role. 5R had been concealing major amounts of funnel glass in multiple states and had great liabilities that were concealed from Mr. Shibilski. That's without a doubt. It's not really even subject to debate. The question then became as he consulted for 5R whether he was a control person and the circumstances of that particular liability as to whether it was mitigated. He was deceived at various points in time. He did sign an agreement with the IRS. I'm the person you can talk to. I'll work this out and he went to seek loans. He borrowed money. He was more than a consultant. He was CEO and he had a title so that would allow him to attract financing and equity interest. He did. But he worked full time at another company. He was at this company maybe once or twice every two weeks. That's true. So the upshot of it is this. A plea agreement was forged. The plea agreement states very clearly what the factual basis is and it states that he didn't mind the shop and should have been more diligent about pure extractions and WLS. But he denied being a true control person and he denied having responsibility directly for the relevant conduct. And in an email from the Assistant U.S. Attorney, Mr. Graber, to me after the proffer, you're only going to be charged with this. We can fight it out with regard to relevant conduct at the hearing. He received acceptance of responsibility. There was a... What do you mean he received acceptance of responsibility? That was in the plea agreement. That he would get three points for acceptance of responsibility. Any conditions attached to that? I'm sorry? Any conditions attached to that? Yeah, the condition... Reservation of rights if he were to... The conditions are very clear and I think that's an important point. But with regard to the relevant conduct, it's very clear. That's a matter that's in dispute. It had been debated between us over a number of months and he absolutely had a right to at least set forth, if it wasn't complete defense on control, it was a mitigation opportunity to show the true facts with regard to that. So the conditions are four. It's in paragraph eight of the plea agreement found in Act Three, the record. Number one, accept responsibility to the factor set forth in 3.E. One, provide a full and truthful accounting. No one's accused that he did not. To withdraw... The United States is free to withdraw this recommendation if the defendant has previously engaged in conduct that's unknown to the United States. That was never a factor. It's inconsistent if he had a date of the plea agreement in the sentencing hearing, which is never asserted as well. So as we went to the sentencing hearing, four months after the plea agreement and the PSR was in place, and incidentally on the PSR, we filed objections and cited exhibits to every objection. We were very careful. We cited memos, we cited emails, we cited documents that were in the record. We got to the hearing, and immediately the court seemed to be put out with the idea that we'd have a hearing. We only had a single witness, which was basically an allocution of Mr. Shedelsky. At the outset, the prosecution said they're going to call five witnesses. Now, until that day, we weren't aware what witnesses would be called. I think we were told en route, in flight, that they're going to call five witnesses. The first witness was an IRS agent whose name we don't know. We just said Tim Smith, but it was a name that was not made known to us. And after his examination, when I examined, the judge immediately stated that, you're not getting anything done here. That's not what we're here to talk about. And the question dealt with Mr. Shedelsky's efforts to compromise, borrow money that Mr. Smith was aware of, and why the IRS didn't respond back to that. No issue, you're not going to get anything done, you're to stop. I encourage you to move on, we've got a lot to cover, and you're spinning your wheels. It's completely irrelevant, and isn't getting us anywhere. Please don't take the time to read, there was a portion of a letter I was reading, don't take the time to read that. Okay. And I said, Judge, there's a real valid point, and the point that I wanted to address to the court was the mitigation aspects of Mr. Shedelsky. This guy, one time, he followed right up, we had emails, and incidentally this was asked about on direct as well by the prosecution. But as I tried to explain, the judge said this, go right to it. He doesn't decide whether to accept the offer and compromise. I said, I understand, Your Honor, move on. And I've gotten a story here, there's only one offer. And so I couldn't even ask questions, and I said, may I say anything? You may say one sentence. And I said, and I'm not going to allow you to get one sentence that I can say. And the sentence was, this goes to good faith in mitigation on this matter. That's it. You're done. Before I could complete Mr. Smith, it was essentially terminated. Later on- This is the witness, Mr. Brewster, whose direct was about 20 minutes and you were about an hour in the cross. Is that somebody else? I heard counsel say that, but we actually counted the lines. A total amount was, the government took, with Mr. Smith, I believe it was 14 pages, and the government took, the cross-examination was 27 pages. So it was a little bit more than twice as much, or a little less than twice as much, but I was covering the same points it was covered on direct. Then, throughout the examination, it would just be interrupted or terminated in examination. Not for the government, just for the defense. Give me a little bit of, so when I put the defendant- Could you address the judge's explanation for that, which was that you were taking a different approach. He understood the theory to be about, the hearing to be about, who was in control of 5R's finances at the relevant times, which you all were disputing. That's why the hearing was scheduled for this unusually lengthy sentencing proceeding. Then you shifted gears to trying to focus on good faith and there was nothing that I shifted to, sir, all of it was in our papers, in response to the PSR, our objections, and our sentencing memo, everything. There was no- Sure, it's all in the papers, and you've got a very thorough sentencing memorandum, which I'm sure Judge Peterson considered carefully. But- You know what he said about that? Before the hearing, he said this. This is in his rendition, and this is what really gave me pause. He said, when I first read the sentencing memo, I had to say it was clear to me, that based on the presentation and everything I had heard, that Mr. Shabilsky had not accepted responsibility. So before we got there, without any notices to me, he had a preconceived notion from the sentencing memo. The sentencing memo mostly dealt with Mr. Shabilsky's background, and they dealt briefly with 5R. But he had already determined that we were not going to have- Obviously, Mr. Shabilsky has had a full life, has done public service. There are many good things about him, as Judge Peterson acknowledged in his explanation of the sentence. But he also was seeing, as I say, minimization and deflection, the opposite of acceptance of responsibility in that memorandum. Now, you may disagree with him. But in terms of spinning wheels, you've now used up more than two-thirds of your allotted argument time, and I haven't heard an error yet. Okay. Well, obviously, there's a little bit of factual background here, but I want to say this. When Mr. Shabilsky got on the stand, I asked him to give us a little bit about himself, 10 or 15, 15 or 20 seconds. No. You don't even get 15 or 20 seconds. Move on. He couldn't even explain any background. Give me a little bit about yourself in 15 to 20 seconds. Even that, we were under the gun. With regard to- Mr. Shabilsky had a full opportunity of elocution? No. No? No. Matter of fact, when you say a lengthy sentencing here, lengthy sentencing here was set for the government because they called all the witnesses. We simply were there for an elocution. When I called Mr. Shabilsky for an elocution and a law cross-examination as a witness, he couldn't even say 15 to 20 seconds about himself. It was shut off. Now the point about Judge Peterson saying he'd made up his mind, it was clear to him. If I had known that, if he would have told us going in, listen, I kind of made up my mind about this acceptance of responsibility, we absolutely would have focused in on that. But I had no clue until the evidence was over. I had no notice of that. When you look at, obviously you know the Cunningham case, this is much more egregious than the facts in Cunningham. For example, when I had Mr. Shabilsky on the stand, he just cut me off, you're done. He told me I'd have an hour, he gave me 40 minutes. After cross-examination, when we came back for the argument, I said, could I call him briefly on a couple of issues? No. No opportunity. Now the point clearly is this, if the government took the position that Mr. Shabilsky hadn't accepted responsibility, it certainly wasn't set forth in their motion or their objections to the PSR. The PSR recommendation is to receive that. And we didn't know the judge's predisposition on this issue, or we would have dealt with it. We had no notice of it. Incidentally, I... Well, but aren't those just recommendations? I mean, the plea agreement says the government's going to recommend acceptance of responsibility. The PSR recommended or, you know, the granting of acceptance of responsibility. But in the end, it comes down to the judge, and a part of what the judge considers is what happens during the sentencing hearing, right? So there's nothing written in stone or agreed to that would give Mr. Shabilsky the misimpression that those acceptance points were guaranteed. The point is this. What was intended to be mitigation evidence, the judge was offended by any of it because he thought there was only a single issue, and that was control. He misapprehended our efforts to show mitigation on the relevant conduct, which we should have had a right to do. He had a preconceived notion without letting us know that, so we could address that. But weren't all those issues explored in the written submissions that you made to the judge, the objections to the PSR, the sentencing memoranda, the arguments you made at sentencing? I mean, what more, what extra could you have elicited from Mr. Shabilsky during that hearing? Well, we could have put on evidence, and I attempted to put on evidence in the mitigation, the backdrop. For example, the accountant had been there 15 years, said that Mr. Shabilsky wasn't involved in the business. I mean, there's no question, but we never had a chance. But those things, what those people said, the prior employees, that stuff is in the record, right? I mean, they testified to what? The elocution is a very important part, and for the defendant to get up there, and when I asked, could you tell us a little bit about yourself, no. You don't even get 15 seconds. That wasn't during the elocution. I'm sorry, sir. That wasn't during elocution. Well, it was during his, I called him as a witness to elocute, as well as I knew there might be a post-hearing or post-evidentiary presentation elocution. There has to be. Yes. Right, so this was during the evidentiary presentation, not the elocution. And incidentally, he really attacked the elocution, but the elocution was nearly word for word that was in the factual basis for the plea, almost word for word. So, what would it have added? I'm sorry, sir. Are we talking about what you wanted to put on was word for word, or what you said word for word? No, no, he understood his responsibility and guilt, and he, when he elocuted very clearly, went right back, he authorized me in the statements on the plea agreement, the factual, and he restated it. I mean, I don't, and the judge then said he did not accept responsibility for the relevant conduct, but, and he was angry because any effort to try to show mitigation, and Cunningham really goes to this question. This is a situation where he had no real opportunity, seriously. The judge had a preconceived, as he expressed, that he clearly thought. Well, look, judges are expected to prepare for these hearings, right? Right. They don't shoot from the hip. Right. We're not shooting from the hip this morning. Right. And so, the judge alerted you, this is an issue. No, not until the end. At the end, when he gave sentence. I thought he told you at the very beginning. No, not at all. Explain to me what you, I thought you told us earlier, he told you at the beginning of the hearing that based on the written submission, he had questions about acceptance. No. If he would have, we might not be here. Never a hint there was any question about that. This would be the moment if there were a court reporter that we'd ask the court reporter to read back what you just said, because you just said something entirely different. I'm sorry. No, there was no indication the court was concerned with acceptance of responsibility until the end, after the evidence was in. Then he said, when I read the sentence, it clearly appeared to me. Well, how would I have known that? We would have put on evidence. Acceptance is always in play, okay? Your brief seems to argue that the judge was bound by your agreement with the government. No. He was not. That's not my argument. My argument is, if the court has a preconceived notion, and incidentally, there's so many factual errors in the decision, I don't have the time and I won't, but the point is, like Cunningham, this allocution, this opportunity for the defendant, and this solemn process to address the court's concern never had a chance. It was at the end of the evidentiary presentation by the government, and the evidence that we were trying to show through mitigation, for example, two of the people they called were already gone by the time the tax issue accrued. The accountant said that he wasn't involved in it. Mr. Burster, your time has expired. I'm sorry. Thank you. Sorry. But I want to make it clear, because had... Mr. Burster, your time has expired. That means it's time to sit down. Thank you very much. Thank you. I appreciate your audience today. Thank you. Mr. Graber. May it please the court. Good morning, Your Honors. My name is Dan Graber. I'm the prosecutor that handled the case down below. Let's just start with the evidentiary hearing. The defense objected to tax loss in relevant conduct. The defense was arguing that the defendant wasn't in control of five hours, so Judge Peterson said, we're going to have a hearing on it. We have to have a hearing on it because I carry the burden of proof by preponderance for reliable evidence. PSR objection, they said, I had unreliable evidence, so we had to have a hearing. And that was very clear going in. Very clear going in. No surprises about that. There's no surprise. In fact, on October 26th, the judge issues an order saying, we're going to have a four-hour hearing, and that's it, to do this. That's four months before, six months before. Then on the day before the hearing, the judge enters another order saying, we're doing four hours. I'm going to give you this much time to do the evidentiary hearing. The morning of the hearing, the judge says, Mr. Graber, what's the game plan? I got seven witnesses, Your Honor. I'm going to put in, and I got all 80 exhibits. Mr. Brewster, what's your game plan? I want to call the defendant. Mr. Brewster, how much time do you need? I need an hour. All right, I'm going to give you an hour. I'll give you, Graber, a half hour per cross. We back out from that. Mr. Graber, you got 2.5 hours to put your case in. Do the best you can. I put in five witnesses because the first witness, Mr. Smith, the IRS agent, I do a direct on 20 minutes, and it's an hour-long cross. During that cross-examination of Mr. Smith, Judge Peterson was trying to get Mr. Brewster to move on. Three times he gave him warnings, saying, Move on. You're covering. Move on. I get it. Because what the defense tried to do was hijack the evidence you're hearing and turn it into a character mitigation argument. Basically, I want to put on a character mitigation case as opposed to our whole purpose was PSR objection tax loss. Were you in control of 5R or not? Because the tax cost goes from 197 to 858. That was the whole point of this. So Judge Peterson was trying to say, Move on. Please move on. Please move on. Gave him three warnings. Finally, at the end of Mr. Smith's cross, when he's done, the judge says, Look, that was not helpful. If you continue down this road, I'm going to cut you off next time after five minutes. The defense says, Oh, okay. Perfect. Not objection. Not here's my offer of proof. Here's all the stuff that I want to get in that you're cutting me off on. There was no cutting off by the defense by Judge Peterson. The other thing they talk about is when Mr. Shabelsky got on the stand, the judge, the judge says, Just be really concise, Mr. Brewster. I think I have the gist of your contextual story here, meaning 5R had financial problems. You're saying that you have a limited role. So, please focus on what Mr. Shabelsky needs to say. I feel very confident you do, Judge. I really do. Again, no objection, no saying that you're not giving me enough time. Starts out by saying, Can you give me a little bit about yourself in 15 to 20 seconds? Judge Peterson says, I wouldn't even take 15 to 20 seconds. I read your sentencing memo. I saw all the exhibits. Defense counsel says, Okay, including the recommendation letters? Yes, I've read all the letters and you epigraphed them repeatedly throughout your sentencing memo, so I saw them more than once. All perfect. And then they launch into his argument as to why he wasn't in charge of 5R. He talks about how we, the plea agreement, paragraph 3 of the plea agreement, typical, we make a recommendation, but if you go south at the sentencing hearing, then we can pull it. He put in the will it affidavit. It's exhibit 9, it's in the 90, exhibit 97, where he's putting in all these emails between me and him during plea negotiations. That's not, Judge Peterson didn't have any of that. That was filed all after the sentencing hearing. He's trying to fat up the record for appeal on his bail pending appeal, which was the separate appeal that they filed going up and this court denied it. But he threw all that in there. Judge Peterson never saw any of that stuff. But the plea agreement, they put in the will it affidavit, the dirty lawyer that basically said Shabelsky wasn't running 5R. And I came back because I had the burden and I thoroughly discredited the will it affidavit. When the defendant took the stand, I asked him, you're saying you're not in charge of 5R? Nope. You submitted this will it affidavit? Now, up to then, he hadn't, the defendant hadn't said with an affidavit, hey, I accept this. He just put it in there to just say there. So I didn't yank acceptance because the defendant wasn't backing it. Once he backed it under oath after seeing all the evidence, my five witnesses, my 80 exhibits, and he gets up there and backs up and says, yeah, the will it affidavit's fine. I wasn't in charge. And I gave him a chance to recant. That was my last question on cross. He said, nope, I'm not going to recant. Fine. When the evidence was in, I told the judge, I'm yanking acceptance, judge, because now he's crossed the line. He's lied under oath. He had a chance to not affirm. He did affirm the will it affidavit, and then he didn't recant it. The judge allowed the parties then to have argument on that. There was no cutoff on the allegation, Judge Hamilton. No cutoff on allocution. He let the defense counsel fully allocute. He let the defendant fully allocate. There was no cutoff on that. So this whole argument about there was a surprise, that there was cutting off of the defense ability to present its case, that simply didn't happen. I've read to you the two points with regards to the Tim Smith cross-examination and then the defendant's direct. This argument under Cunningham, they're arguing a Rule 32 violation. There's no Rule 230 violation. Rule 32 doesn't apply. Rule 32 I-4 talks about the right to speak. It's the allocution part of the rule, not the evidentiary hearing part. So they just picked the wrong basis for an error. In Cunningham, this court did say, look, unreasonable truncation. When the district court's got some things in place and it may be a barrier and there's an unreasonable truncation, we won't allow it. He had a seven-hour hearing, more than enough chance to present whatever evidence he wanted to. Three hours beyond the allotted time. Three hours beyond the allotted time. And one thing I want to point out, in the rebuttal brief, they put in Mr. Brewster's affidavit saying, here's all the stuff I would have said and I would have done. That's raised for the first time in the rebuttal brief. You can't raise that the first time in a rebuttal brief. That's waived. So when they're citing that in the rebuttal brief saying, well, here's all the stuff we would have brought in, that was never in front of Judge Peterson. There was never a Rule 10 motion to have the record supplemented. The argument in the rebuttal brief is, well, it helps to correct or provide context. No, it doesn't. They're just trying to fatten up the record because they want to prove prejudice on plain air, which they can't do. So the Rule 32 violation, there wasn't even a Rule 32 violation. They can't even get close to getting around plain air on that. On the acceptance issue, again, as the court noted, Judge Peterson, you know, when I argued let's yank it and we argued it, the judge said, you know what, Graber, I'm not going to. I'm going to reserve. I'm giving this guy a life preserver. I'm going to give him a chance to fix it. I want to hear a sincere, contrite, and remorseful acceptance of responsibility during allocution. Defendant gets up and allocutes, does the complete opposite, petty, arrogant, defiant, blames everybody else, blames the IRS, blames his co-defendants, says he's a victim of fraud. Judge Peterson's jaw dropped, and he makes the comment, you know, no reasonable person sitting in this courtroom would have believed that this man accepted responsibility. That's when he yanked acceptance, only after that. And as the court knows, under 3E1.105, district courts allowed great deference because they're an eyewitness sitting there watching the defendant allocute. So there's no clear error there, Your Honor, in terms of the acceptance being yanked. And as you noted, this plea agreement, the court wasn't even bound by the plea agreement anyway. The last issue is just the sentencing. Procedural error, they're arguing procedural error in sentencing, in that Judge Peterson didn't hit all the 3553A factors. He did, and I go through in my brief how he methodically marches through. The big one they talk about is character and history. If you read Judge Peterson's order, he said, you know, that's a really outrageous mischaracterization of the evidence. The first thing Judge Peterson did when he went through the 3553As, I'm going to begin my discussion by the character of the defendant. That's somewhat unusual because usually I start with the discussion of the crime. But one of the key considerations is the character of the defendant, and I think there's no doubt that apart from this conduct, Mr. Shabilsky is a well-respected person. Then the judge goes on. It's unusual, of course, that Mr. Shabilsky has letters from such prominent people, and he had such a well-known position in the state and in the community. He was a former state senator. Tommy Thompson, our governor, did a letter of recommendation. Kathy Stepp, the director of DNR, did a letter of recommendation for him. So Judge Peterson says, so how is it that we end up with a defendant who is so well-regarded but has committed an offense like this? And then he goes through. There's three components to why he did it, compartmentalization, rationalization, and self-delusion. So Judge Peterson, first thing out of the box, he deals with character and history of the defendant and then methodically goes through that. So that was not ignored, and it was not an issue where they're saying that there was no meaningful consideration factor. The role of the offense, they say, again, that Judge Peterson didn't consider that. That was the whole reason for our evidentiary hearing was role, and the judge specifically found that our evidence was credible, that our witnesses were all consistent, they were corroborated with physical evidence, and contrary, the defendant lied, that he was not in control. He also argues the disparity argument that I just want to touch on real quick, the 3553A6 disparity argument. They list in their sentencing memo seven different defendants. They give the guidelines range and say, well, look, all these guys, they're all tax defendants, here's their range, a lot higher, and they all got probation, so you should give my guy probation. That was all in their sentencing memo. Judge Peterson said, look, I've read your sentencing memo, I've read all the pleadings that you've presented to me, and I'm giving you 33 months. In his statement of reasons, he explains the other two co-defendants that are similarly situated are Bonnie Denny and Jim Moss. They cooperated. They sat down and cooperated, pled guilty, and they got five Ks. So he did a similar situation, a disparity argument, in looking at other co-defendants. He just didn't use it with these folks, which makes sense because with those folks, you don't know what the other 3553A factors are on those other seven defendants. Were any of those from within that district? No. And Mr. Shabelsky did get a guideline sentence? Yeah. 33 to 41, he got 33, and that's why under Sanchez, we said time and again, sticking with the guidelines, I'm not personally as big a fan of the guidelines, but that's a different question, but that sticking with the guidelines takes care of disparity arguments. Which is the argument that I was trying to make in there, citing Sanchez for this court's position, and I think there's a quote, you start with a position that it's reasonable and you're within the guidelines, and there's got to be some major factor to say that it's outside of it, and in this case, there simply wasn't. He hit all of the elements that he was supposed to do. That is all I have for the court, unless the court has questions for me, so we'll sit down. I'd ask you to affirm the judgment of the district court. Thank you. All right, thank you very much. Mr. Brewster, your time has expired. I will give you a brief minute to rebuttal, if you have something to say in conclusion. You can have a minute. I think what's really lost is this. There was no question there was going to be the relevant conduct contested. That's what we were there for, and that's what I was there for, to show mitigation, to show what elements of control existed. What I didn't know was by having the relevant conduct evidentiary pushback that he was going to take acceptance of responsibility away. I mean, we had agreed that we can fight it out, his terms, in the courtroom with regard to relevant conduct. The guidelines was 17 in the pre-sentence investigation report. What happened was, in dealing with the relevant conduct and trying to put it in its true light through their witnesses only, the court preconceived, he admittedly preconceived the belief that we weren't accepting responsibility. Mr. Shabilsky, in his elocution and on the stand, fully accepted responsibility, almost word for word, that was set in the plea agreement. So at the end of the hearing, when the judge shut us off on all these points, his thinking was only the control feature and that I couldn't put on mitigation evidence, and this is directly addressed, very clearly addressed, in Cunningham. And also Sientowski, which is a 2004 case, no notice. The court says the district court did not satisfy its obligation to provide the parties with notice and an opportunity to be heard regarding enhancements. You're going to have to wrap up. I think we have a gist. Thank you so much. I appreciate it. Thank you. Our thanks to both counsel. The case is taken under advisement.